
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 6, 2016

**ALEXIS MASON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 09-04389      Lee V. Coffee, Judge**

_____

**No. W2015-01644-CCA-R3-PC**

_____

Alexis Mason ("the Petitioner") was convicted of one count of second degree murder and three counts of aggravated assault by a Shelby County jury, for which the Petitioner received an effective sentence of thirty-seven years. The Petitioner filed a petition for post-conviction relief arguing that trial counsel was ineffective for failing to argue self-defense. The post-conviction court denied relief after finding that trial counsel's failure to argue self-defense was not deficient and did not prejudice the Petitioner. On appeal, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Monica A. Timmerman, Bartlett, Tennessee, for the appellant, Alexis Mason.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Amy P. Weirich, District Attorney General; and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

*Jury Trial*

On direct appeal, this court summarized the facts of the Petitioner's case as follows:

Laketra Campbell testified that the last time she saw her sister, Sabrina [Campbell], alive was on March 21, 2009.  Laketra stated that on March 20, 2009, she loaned her car to her friend, Sherika Swift, and her sister.  When her sister and Swift returned home with Laketra's car, it had a dent in it.  Laketra later learned that [the Petitioner] was responsible for the dent in her car.  That same day, Laketra called [the Petitioner] to inquire "what happened," and [the Petitioner] "[went] off and start[ed] cussing," so [Laketra] hung up the phone.

The next day, March 21, 2009, Laketra called [the Petitioner] and told her that she was on her way to her house.  Laketra, Sabrina, Swift, and [Shamika] Farris drove to the home of Swift's boyfriend, Rernardo Wilson,[1] and dropped off their children.  On her way to [the Petitioner]'s house, Laketra saw [the Petitioner] and Derwin Owens.  When Laketra asked [the Petitioner], "Why is this dent in my car," she said that [the Petitioner] "talked crazy" and was "cussing."  Laketra said that [the Petitioner] specifically told her, "Bitch, I'll kill again."  Eventually, Farris, age fifteen at the time of the offense, and [the Petitioner] began to fight. [The Petitioner] had a knife; however, Owens took it from her.  During the fight, [the Petitioner] was biting Farris "like a pit bull," so Laketra hit [the Petitioner] to get her off Farris.  Laketra said that [the Petitioner] went into the house and grabbed a broomstick, but Sabrina took the broomstick from [the Petitioner] and struck [the Petitioner] with it.  Laketra then saw blood coming from a cut on [the Petitioner]'s eye.  After approximately ten minutes, they stopped fighting.  The victims got in the car and left.

Laketra, Sabrina, Farris, and Swift drove to Wilson's house to check on the children.  Before Laketra left the area, [the Petitioner] called her on the phone.  Laketra was able to see [the Petitioner] on the phone, standing outside of a black SUV waving a gun in her hand, but [the Petitioner] could not see Laketra.  Laketra tried to "ride past [the Petitioner] real fast."  When Laketra drove past the SUV, she saw the driver of the SUV and described him as a man with a dread lock hairstyle.  Laketra later noticed the same SUV "on the side of her [car]" forcing her to "slid[e] and hit[ ] somebody's car[.]"  She pulled her car to the side of the street, and the SUV pulled beside them.  [The Petitioner]'s hand came out of the window of the SUV, and the victims said, "'We [sic] fixing to die.'"

---

[1] Mr. Wilson's name is spelled "Rernardo" and "Renaldo" alternatively in this court's opinion from the Petitioner's direct appeal.  For purposes of clarity, we will refer to Mr. Wilson as "Rernardo."

Laketra heard shots and closed her eyes. When Laketra opened her eyes, her sister, Sabrina, had gotten out of the car. Laketra and the other passengers stayed inside Laketra's car for fear of being killed. Laketra panicked and later heard Sabrina say, "'I'm shot.'" Laketra and the other women then saw Sabrina "[fall] down real slow." Laketra called for help from a house nearby the shooting.

Laketra identified [the Petitioner] as the shooter in a photographic lineup on the day of the offense and at trial. Laketra also identified [co-defendant] Harris as the driver of the SUV in a photographic lineup on the day of the offense, which was admitted as an exhibit at trial. Laketra was unable to identify [co-defendant] Harris as the driver of the SUV at a previous hearing in May 2009, because he had a different hairstyle.

On cross-examination by [the Petitioner], Laketra was questioned regarding her preliminary hearing testimony and the statement she gave police soon after the shooting. She acknowledged testifying at the preliminary hearing that she closed her eyes during the shooting. She acknowledged telling the police that she drove to Wilson's house after the initial fight to get two crowbars. She testified at trial, however, that the crowbars had been in the car all along.

On cross-examination by [co-defendant] Harris, Laketra testified that she had never seen [co-defendant] Harris before she drove by him at the time of the shooting. He was not involved in the earlier confrontations. Laketra further acknowledged getting mad after she spoke to [the Petitioner] on the phone the evening of March 20.

On redirect examination, Laketra's police statement was admitted as an exhibit. Laketra testified that the crowbars had been in the car before the fight and that the women did not take them out of the car.

Sherika Swift, a long time friend of Sabrina and Laketra, testified consistently with the testimony of Laketra. She additionally said that on the day before the offense, Laketra allowed her to use her car. Swift drove Sabrina to the home of [Rernardo] Wilson, Swift's boyfriend at the time, to drop off their children. As Swift backed out of the driveway, she "bumped" a car that belonged to Derwin Owens, [the Petitioner]'s boyfriend. Swift approached the car to apologize and heard a voice from the back say, "She hit your car." Swift replied, "Bitch, I know I hit his car." Swift apparently returned to her car, and [the Petitioner] approached

Swift's car saying, "Who's the bitch?" [The Petitioner] was "hollering" and telling Swift to get out of the car. Swift did not respond and attempted to leave. As she pulled off, [the Petitioner] kicked the car.

The next day, Swift drove back to Wilson's house to pick up her child. Swift said Sabrina, Laketra, and Shamika went with her. Laketra asked Wilson about her car, and he told her to ask [the Petitioner] and Owens. As Swift drove down the street, she saw Owens and asked, "'What happened to the car? What happened last night?'" Swift said that Owens told her, "'You better leave before I put my bitch on you.'" The women then saw [the Petitioner] come outside.

Swift said that they backed up the car and asked [the Petitioner] about the incident with the car. Swift stated that [the Petitioner] taunted them, telling them to get out of the car and "jack or whatever." Although Laketra said they did not want to fight, the women eventually fought in Owens's front yard. Swift did not observe how the fight started. As the fight was ending, [the Petitioner] said, "I got you hoe's. I got you . . . . It ain't over with. I got you hoes."

Within five minutes after the fight, Swift saw [the Petitioner] standing beside a black SUV with a gun in her hand. Swift had not seen either the SUV or the gun during the earlier events. She saw [co-defendant] Harris in the driver's seat with the window down. As the women drove past the black SUV, it began chasing them. The women's car slid and hit another car. The SUV pulled alongside their car, and Swift heard a woman's voice say, "These bitches got me f——— up. I'm going to make The First 48 tonight." Swift then saw shots being fired from the right side of the SUV at the women in the car. Swift and Farris, who were both in the back seat, ducked. One bullet entered the window near where Swift was sitting and another went in the roof of the car. After the SUV pulled away, Swift discovered Sabrina had been shot and was lying outside of the car near a driveway.

On cross-examination by [the Petitioner], Swift acknowledged that she had previously testified that she did not see who fired the shots. On cross-examination by [co-defendant] Harris, Swift testified that [co-defendant] Harris was not present for the incident at Wilson's house on March 20. He also was not present for the fight on March 21 when [the Petitioner] said, "It ain't [sic] over with. I got you hoes." Swift acknowledged telling the police that Farris followed [the Petitioner] onto

- 4 -

Owens's property before the fight began, but she denied this at trial. At the time of the shooting, the passenger side of the SUV was positioned next to the driver's side of the women's car.

On redirect examination, Swift testified that she previously told the police that [co-defendant] Harris was driving the SUV and [the Petitioner] was in the front passenger seat. Swift's police statement was admitted as an exhibit.

Shemika Farris testified substantially the same as Laketra and Swift. After the fight, when the women drove by the SUV, Farris saw [the Petitioner] with a gun in her hand about to get in the SUV. On cross-examination by [the Petitioner], Farris denied that the women were looking for [the Petitioner] to start a fight with her. She acknowledged that she did not tell police that [the Petitioner] was in the front passenger seat of the SUV at the time of the shooting. On cross-examination by [co-defendant] Harris, Farris testified that when Laketra first saw that [the Petitioner] had a gun, Laketra was going to hit [the Petitioner] with the car to prevent her from shooting the women. She acknowledged that she told the police that Laketra was going to hit [the Petitioner] but changed her mind when Laketra saw that [the Petitioner] had a gun. On redirect, Farris testified that she told the police [the Petitioner] was the person who shot Sabrina. Farris's police statement was admitted as an exhibit.

Rernardo Wilson testified that he was dating Swift at the time of the offense and that his cousin, Derwin Owens, was dating [the Petitioner]. The day before the shooting, Wilson saw [the Petitioner] standing outside Swift and Sabrina's car, arguing. The next day, the victims came and left his house twice. After they left the second time, [the Petitioner] arrived as the passenger in a black SUV driven by a man with dread locks. [The Petitioner] got out and told Wilson, "Call them bitches back." Wilson saw [the Petitioner] standing near the hood of the SUV and called Swift to tell her not to return because [the Petitioner] had a gun. By the time he called, the women were already at a nearby intersection. After the women turned onto his street, [the Petitioner] got into the SUV, which followed the women. After the cars turned the corner, Wilson heard gunshots.

Teresa Harris was outside on her front porch on the day of the shooting. She saw a car stop in front of her neighbor's house. A black SUV with a woman in the passenger seat came from the same direction as the other car. The women in the first car got out and started running.

Teresa then saw the woman in the SUV point a gun out the window and fire four or five times, shooting one of the women in the other car.

On the day of the shooting, Cassandra Allen-Wolfe was inside her house when she heard four gunshots. She looked out her window and a woman knocked on her door. Allen-Wolfe went outside and saw another woman screaming that she had been shot. Allen-Wolfe called 911. Her father's car, parked in front of her house, had a bullet hole in the trunk. A photograph depicting Allen-Wolfe's house and her father's car in front of the house was admitted as an exhibit.

. . .

Special Agent Cervinia Braswell, a forensic scientist with the firearms identification unit of the Tennessee Bureau of Investigation, examined a bullet removed from Sabrina's breast and a bullet removed from the trunk of the car parked in front of Allen-Wolfe's house. Special Agent Braswell determined that the bullets were fired from the same gun.

Dr. Miguel Laboy of the Shelby County Medical Examiner's Office performed the autopsy of Sabrina Campbell. Dr. Laboy testified and described two gunshot wounds on Sabrina's body. One bullet entered the lower left back, perforated the left iliac vessel and the stomach, and exited on the front right side of the abdomen. The other bullet entered the right breast from front to back. Dr. Laboy recovered the bullet from Sabrina's body. Dr. Laboy testified that the gunshot wounds caused Sabrina's death and that the manner of death was homicide. A number of autopsy photographs and an autopsy diagram were admitted as exhibits.

Neither [the Petitioner] nor Appellant Harris presented proof. The jury convicted [the Petitioner] of the lesser included offense of second degree murder and three counts of aggravated assault. . . .

State v. Alexis Mason and Terrance Harris, No. W2010-02321-CCA-R3-CD, 2013 WL 1229447, at *1-6 (Tenn. Crim. App. Mar. 27, 2013), perm. app. denied (Tenn. Sept. 16, 2013). On appeal, this court affirmed the Petitioner's convictions and sentence. Id. at *1. Our supreme court denied further review.

The Petitioner filed a timely petition for post-conviction relief. At the post-conviction hearing, trial counsel testified that he had been practicing law for thirty years when he represented the Petitioner and that he had "tried at least eighty or ninety murder cases." After he was retained to represent the Petitioner, trial counsel met with the Petitioner. Trial counsel testified that he "proceeded on the theory of misidentification" in the Petitioner's defense because he interviewed the Petitioner and she "indicated to [him] that she was not there that day[.]" Trial counsel explained that the theory of self-defense and the theory of misidentification are "mutually exclusive" because arguing self-defense would have placed the Petitioner at the scene of the crime. Trial counsel also noted that the Petitioner had never informed him that she had any mental health or substance abuse issues. Trial counsel further testified that he was formerly a "licensed psychiatric technician" and that if the Petitioner "had had some mental issues, [he had] been trained to recognize that."

Trial counsel stated that the Petitioner had never expressed to him that she had been acting in self-defense when she shot at the victims. Trial counsel stated that he did not recall discussing the theory of self-defense with the trial court and co-defendant Harris' attorney. On cross-examination, trial counsel testified that he objected when co-defendant Harris' trial counsel based his defense theory on self-defense and placed the Petitioner at the scene. Trial counsel stated that if he had thought that the Petitioner had any mental health issues, he "would have either asked for a competency hearing, or if [he] thought it was necessary, [he] would have asked for the appointment of a psychiatrist to pursue an insanity defense." The post-conviction court then questioned trial counsel, who agreed that the theory of the Petitioner's defense was "that this was a misidentification and this was a revenge in which folks were seeking revenge against [the Petitioner.]" Trial counsel noted that, after co-defendant Harris presented his theory of the case in a way that seemed to implicate the Petitioner, he asked the trial court for a mistrial or to sever the case, and the trial court denied both motions.

The Petitioner testified that she was indicted in 2009 for first degree murder and that her family retained trial counsel. The Petitioner stated that she never posted bond and that trial counsel never met with her in jail. Instead, trial counsel only met with the Petitioner at her court dates. The Petitioner testified that she told trial counsel her version of the events but that trial counsel only "wanted to do what he wanted to do." The Petitioner testified that she told trial counsel she acted in self-defense when she shot at the victims. The Petitioner stated that she received threatening phone calls from the victims before the shooting but that trial counsel "never asked about the phone calls." The Petitioner stated that she wanted to testify at her trial but that trial counsel advised against testifying. The Petitioner stated that during this period of her life her mental state

"was kind of off balance." The Petitioner did not see a doctor but diagnosed herself as bipolar and self-medicated with ecstasy pills and marijuana. The Petitioner testified that she was under the influence of marijuana during the incident. The Petitioner stated that she informed trial counsel that witnesses had changed their testimony between the preliminary hearing in general sessions court and court dates in criminal court but that trial counsel became angry and aggravated with her.

On cross-examination, the Petitioner stated that trial counsel never met with her while she was incarcerated. However, the Petitioner agreed that she testified under oath during the <u>Momon</u> hearing that she had discussed her testimony and case with trial counsel and that it was her decision to not testify at trial. The Petitioner stated that at trial she did not want to testify because trial counsel had advised against testifying and she "believed him." The Petitioner noted that she had her "life," meaning she had not been sentenced to life in prison, and she agreed that due to trial counsel's efforts she had been convicted of the lesser included offense of second degree murder instead of first degree murder.

The following exchange occurred:

Q: You're telling the [c]ourt that you wanted [trial counsel] to present the defense of self-defense?

A: No.

Q: No?

A: I don't recall. I don't - - I can't remember that.

Q: Well, when [post-conviction counsel] was asking you a minute ago, she said you did not want this defense of mis-I.D. . . . because you were there?

A: No, [trial counsel] asked me was I defending myself, and I told him, yes, when it came to fighting me, yes, I was defending myself[.]

The post-conviction court then clarified it was the Petitioner's testimony that she did not shoot the victims and that co-defendant Harris shot at the victims while the Petitioner was in the vehicle. The Petitioner agreed that she told the police that co-defendant Harris shot at the victims and that she shut her eyes, heard gunshots, and left the scene. On recross-examination, the Petitioner agreed that if she had testified at trial,

- 8 -

she "might have got[ten] a better deal" or she might have been convicted of first degree murder.

The post-conviction court questioned the Petitioner, who stated that trial counsel did not listen to her version of the facts, such as her assertions that she did not have a knife and that the victims were the individuals with the broomstick, not her. The post-conviction court noted that trial counsel had filed a request to withdraw as counsel before trial because the Petitioner "did not think counsel was doing enough for her." The trial court denied trial counsel's motion to withdraw because the withdrawal would have delayed the Petitioner's trial. The Petitioner stated that she was "satisfied that [she] got second-degree murder and not first" but stated that trial counsel did not argue the motions he filed on her behalf with the trial court. The post-conviction court stated that "the record of this trial would indicate that [trial counsel] argued vigorously and vehemently on [the Petitioner's] behalf[.]" The Petitioner maintained that trial counsel "could have argued a little more[]" and that her charges "could have been knocked down a little further."

The post-conviction court found that the Petitioner and co-defendant Harris "had mutually exclusive defenses at trial" and that trial counsel had asked the trial court to sever the Petitioner's case from her co-defendant's case. The post-conviction court noted that the Petitioner "indicate[d] that she [did] not believe that self-defense was relevant or was a theory that could have been submitted to the jury[]" because the Petitioner "always maintained that . . . she had nothing to do with this shooting, that she was not present, [and] that this was some kind of retaliatory act because of fights and arguments[.]" The post-conviction court found that "the decision not to argue self-defense was a tactical decision that [trial counsel] made and that that tactical decision was made after adequate preparation [and] after adequate investigation of this case[.]" Additionally, the post-conviction court found in its written order that the Petitioner "admitted at the evidentiary hearing that she did not have a defense of self-defense." The post-conviction court found that "[t]rial counsel investigated and interviewed any witnesses provided by the Petitioner[,]" that trial counsel "vigorously challenged and cross[-]examined prosecution witnesses[,]" and that the Petitioner "does not specify what other defense [trial] counsel should have pursued." Therefore, the post-conviction court found that trial counsel was not deficient for failing to argue self-defense.

The post-conviction court also concluded that the Petitioner had "failed to show any prejudice of any alleged ineffective representation of [trial counsel]." In its written order, the post-conviction court found that the Petitioner "was unable to demonstrate how further preparations by her trial counsel might have been helpful" and that "[t]rial counsel made a well-founded strategic choice to challenge the identity of the [Petitioner] in this

case." The post-conviction court denied the Petitioner's petition for post-conviction relief, and this timely appeal followed.

## II. Analysis

On appeal, the Petitioner argues that trial counsel was ineffective in failing to argue at trial that the Petitioner acted in self-defense and to request a jury instruction on self-defense because "evidence was fairly raised that should have been considered by the jury on the issue of self-defense." The Petitioner states that she was prejudiced by trial counsel's failure to raise self-defense at trial because "[h]ad the jury received such an instruction, it is likely that they would have found the Petitioner not guilty of the charged offense." The State responds that trial counsel's performance was not deficient and that the Petitioner has not shown that she was prejudiced by trial counsel's decisions. We agree with the State.

### Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

### Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same

standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

We agree with the post-conviction court that trial counsel's decision to argue the defense of misidentification instead of self-defense was not deficient performance. In Felts v. State, our supreme court stated that "[w]hile counsel may reasonably decide as a matter of strategy to present alternative, even inconsistent defense theories to the jury, we have never held, and decline to hold now, that trial counsel *must* pursue inconsistent defense theories to provide constitutionally effective representation." 354 S.W.3d 266, 280-81 (Tenn. 2011) (internal citations omitted) (emphasis in original). In the case sub judice, trial counsel testified that the Petitioner never asked him to argue that she acted in self-defense. Instead, trial counsel testified that the Petitioner informed him that "she was not there that day." As trial counsel noted at the post-conviction hearing, the theories of misidentification and self-defense are inconsistent with each other. The post-

conviction court found that trial counsel made a strategic decision to argue that the victims misidentified the Petitioner as the shooter, and the post-conviction court found that this decision was "well-founded[.]" The evidence in the record does not preponderate against the post-conviction court's findings.

We need not address whether the Petitioner was prejudiced by trial counsel's failure to argue self-defense because the Petitioner has not established that trial counsel's performance was deficient. See Finch, 226 S.W.3d at 316. The Petitioner is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE